NOT DESIGNATED FOR PUBLICATION

No. 123,625

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of P.B.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; JANE A. WILSON, judge. Opinion filed August 13, 2021. Affirmed.

*James T. Yoakum*, of Kansas City, for appellant natural father.

*Daniel G. Obermeier*, assistant district attorney, for appellee.

Before SCHROEDER, P.J., MALONE, J., and BURGESS, S.J.

PER CURIAM: This is an appeal from the district court's order terminating the parental rights of Father to P.B. while Father was serving a 57-month prison sentence for aggravated battery. The district court found Father was unfit, his unfitness was unlikely to change in the foreseeable future, and termination of parental rights was in the child's best interests. Father contends: (1) the district court erred in terminating his parental rights without exploring less permanent options that were in the child's best interests; and (2) the court-ordered reintegration plan was not reasonable. After carefully reviewing the evidence in the record, we find clear and convincing evidence to support the district court's findings that Father was unfit as a parent under Kansas law and that the conditions leading to that finding were unlikely to change in the foreseeable future. In addition, we find evidence supporting the district court's decision that it was in P.B.'s best interests to terminate Father's parental rights.

1

Father's claim that the reintegration plan was not reasonable is raised for the first time on appeal, and he failed to provide an exception to the general rule that issues raised for the first time on appeal should not be addressed. Thus, he waived and abandoned any claim that the reintegration plan was not reasonable. Accordingly, we find no abuse of discretion in the district court's decision to terminate Father's parental rights, and we affirm its judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Department for Children and Families (DCF) removed P.B., a minor child born in 2009, from her Mother's care in June 2012. P.B. was in foster care from June 5, 2012, until June 6, 2013, when she was reintegrated into Father's custody. In December 2017, Mother and her live-in boyfriend were substantiated for emotional abuse of P.B. based on the alleged sexual abuse of P.B. by Mother's boyfriend.

On June 15, 2018, Father was arrested for aggravated battery, stemming from an incident involving Mother and her boyfriend. Apparently, Father followed Mother and her boyfriend in his car when an accident occurred. Father fled the scene, and Mother and her boyfriend were taken to the hospital. Prior to the accident, Father had been "extremely distraught" over the allegation that Mother's boyfriend sexually abused P.B. Father reported that he was set to begin mental health treatment with P.B. P.B. had been diagnosed with PTSD from the trauma that she experienced while in Mother's care. Father eventually pled guilty to aggravated battery—a level 5 person felony—for his role in the accident.

On June 18, 2018, the State filed a petition in Wyandotte County District Court, alleging that P.B. was a child in need of care. The State alleged that P.B. was "without adequate parental care, control or subsistence and it is not due solely to the lack of financial means of the child's parents" and "is without the care or control necessary for

2

the child's physical, mental or emotional health." At the time the petition was filed, out-of-home placement was necessary due to Father's incarceration and Mother's extended hospitalization, as well as Mother's continued relationship with her boyfriend.

In the petition, the State noted that Father had a criminal history including:

- 2007 convictions for aggravated assault, obstruction of legal process, criminal damage, and disorderly conduct;
- 2008 conviction for possession of a simulated substance;
- 2010 convictions for forgery, petty theft, and trespassing;
- 2011 convictions for possession of opiates, battery, domestic battery, criminal threat, possession of cocaine, forgery, and misdemeanor theft;
- 2012 convictions for forgery and violation of a protection order;
- 2016 convictions for contempt of court and domestic battery; and
- 2018 convictions for possession of opiates, possession of certain hallucinogenic drugs, and possession of marijuana.

A temporary order of custody was entered on June 19, 2019, placing P.B. in the custody of DCF. On October 1, 2018, Father stipulated to a child in need of care (CINC) finding on the grounds that he was currently in custody of the Department of Corrections and could not care for her at that time. He understood that this stipulation was not appealable and that it enabled the court to make orders in the best interests of P.B., including placement outside the home. Father acknowledged that P.B. was entitled to permanency in her life and that the district court could terminate his parental rights if its orders were not followed. P.B. was adjudicated to be a CINC.

3

The district court issued numerous orders including a court-ordered case plan for Father to work towards reintegration with P.B. The court assigned Father the following tasks to work toward that goal:

- Father shall have visitation with P.B. at the discretion of the contracting agency;
- Father shall have contact with the court supervising officer once a month;
- Father will obtain and maintain stable housing and income and provide verification of the same;
- Father will participate in a domestic violence assessment and follow through with the recommendations;
- Father will participate in an anger management assessment and follow through with the recommendations;
- Father will complete a drug and alcohol assessment and follow through with the recommendations;
- Father must participate in random UAs upon request; and
- Father must resolve all legal issues.

At a review hearing on February 6, 2019, these orders were reissued. A permanency hearing was held on April 25, 2019. At that hearing the court found that "[r]eintegration continues to be a viable goal" and continued the same orders. At subsequent review hearings held on June 6, 2019, and October 22, 2019, these orders were again reissued. At the October 2019 review hearing, the district court also ordered that a date for a termination hearing would be set.

On December 5, 2019, the State filed its motion for termination of parental rights. In the motion, the State alleged that Father had failed to comply with the court plan or, in the alternative, failed to adjust his circumstances to meet the needs of the child. The State

4

noted that Father had pled guilty to aggravated battery in Wyandotte County case No. 2018CR1288 and he faced a maximum sentence of 60 months in prison. The State asserted that the above-mentioned factors were not likely to change in the foreseeable future, and it was in the best interests of the child that the Father's rights be terminated.

A termination hearing was held on October 27, 2020. The hearing included testimony from Case Manager Andrea Urban of Cornerstones of Care, Court Services Officer Charissa Boldridge, and Father. At the outset of the hearing, the State requested that the district court take judicial notice of Father's criminal case No. 2018CR1288 and that he was currently sentenced to 57 months in prison.

Urban, the case manager assigned to work with Father to implement the reintegration plan, testified that she handled P.B.'s case for a short time in 2019 and then it was transferred back to her at the beginning of 2020. The plan in this case was reintegration with a concurrent goal of adoption. Urban testified that part of her job was to assist Father so that he could comply with the court orders even while incarcerated.

Over the course of the case, Urban was not able to make contact with Father. She sent him numerous letters and attempted to contact him by phone. She also attempted to contact Father's case manager through the jail, and she reached out to his family members in an attempt to connect with him. Urban said she was required to attempt to contact Father two or three times per month.

Father never contacted Urban by mail or returned her phone calls. Urban acknowledged that Father could not complete some orders such as finding stable housing and employment while he was incarcerated but there were other orders that he could work on while incarcerated. Urban had successfully assisted other parents in completing some case plan tasks while in prison. Urban admitted that she did not go to the prison to visit Father because of the COVID-19 protocols in place, but she had been successful in

5

working with other parents via Zoom sessions. In this case, she had not been able to set this up because Father would not contact her. He failed to contact Urban or make any progress on the tasks in his case plan.

Urban testified that Father had made unauthorized contact with P.B. through a telephone call on one occasion. Father had also tried to have letters smuggled to P.B. about a month prior to the termination hearing.

Urban testified that at the time of trial, P.B. was almost 11 years old and had been at her foster placement for over two years. During that time, she had never been reintegrated with either parent for any amount of time. Urban testified that P.B. was not bonded to either of her biological parents, but she was bonded to her foster parents. P.B.'s foster parents provided a source of permanency for her, and they wished to adopt her. P.B. was "very excited" to be adopted and was "counting down the days." She loved her foster parents and did not want to leave them.

Urban testified that P.B. was regularly attending therapy and doing well in school. Urban reported that P.B. would occasionally act out or lie after contact with Father or her grandparents, but the foster parents knew how to handle her behaviors and get her redirected. Urban believed that it was in P.B.'s best interests to have no contact with Father and to be adopted. She based this opinion on P.B.'s "well-being and her happiness to . . . move on" and to have permanency in her life.

Court Services Officer Boldridge testified that she provided Father with the orders of the court in this case. She maintained contact with Father on a monthly basis, and he sent Boldridge six or seven letters over the last two years. Father told Boldridge that he was unable to complete some of the tasks while he was incarcerated because he did not have access to the assessments. Boldridge told Father that he needed to contact Urban, the case manager, and he said he was having trouble reaching her.

6

Father testified that he was the primary caregiver of P.B. from the time she was born until she was removed from his custody. Father testified that while he was incarcerated, he took parenting classes, anger management classes, and domestic violence prevention classes on his tablet. He acknowledged that these classes were not approved by the court services officer and would not count as tasks on his case plan.

Father testified that he would be eligible for release from prison on February 28, 2022, or approximately 16 months from the date of the hearing. Father acknowledged that this was the second time that P.B. had been in the State's custody. Father believed it would be in P.B.'s best interests for her to remain in the State's custody until he was released from prison. Father testified: "I'm her father, and we both love each other dearly." Father stated that he had been there "to help protect [P.B.] and take care of her, which a father should take care of his kids."

At the conclusion of the hearing, the district court stated:

> "[W]e have dad now incarcerated. He will be for at least 16 more months. That's based on his testimony here today. That's best-case scenario.
>
> "Again, we don't have any complete Court Orders completed. They haven't reached out to our Court Service Officer at least [at] any time in the recent past. No contact with Cornerstones of Care.
>
> "There's really not much in terms of this case of positive factors. Dad has done things for himself to make himself better in prison and in jail. I commend that. I think that's great for you, Dad. I think you should work on those things while you're locked up. I don't know why you wouldn't take that time and use it to that effect.
>
> "But the facts are the facts, and it's clear that Dad under [K.S.A 2020 Supp. 38-2269(b)(5)] has a conviction of a felony, and is currently imprisoned based on that, and . . . there has been a failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family, so I do find by clear and convincing evidence that dad . . . is unfit by conduct . . . or condition to make him unable to care for the child."

7

As such, the district court terminated Father's parental rights to P.B., finding Father to be unfit by reason of conduct or condition which renders the parent unable to care properly for the child. The district court found Father unfit as supported by the evidence in the record. The court found that both of the factors of unfitness set out against Father are supported by clear and convincing evidence and are unlikely to change in the foreseeable future. Additionally, the court found that termination of parental rights is in the best interests of P.B. Father timely appealed.

ANALYSIS

Father first argues that the district court erred in terminating his parental rights without exploring less permanent options that were in the child's best interests. In making his argument, he appears to challenge whether clear and convincing evidence supported the finding that he was unfit and that his unfitness was unlikely to change in the foreseeable future. Although the framing of his issues is unclear, he also seems to challenge the district court's finding that termination of his parental rights was in P.B.'s best interests. He claims the district court should have allowed P.B. to remain in the State's custody until he was released from prison and could regain custody. The State contends that there was sufficient evidence to support the district court's findings and the district court was correct to terminate Father's parental rights to P.B.

The Revised Kansas Code for Care of Children provides that after adjudication the district court may terminate parental rights only if it makes three findings: (1) the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child; (2) the conduct or condition that makes the parent unfit is unlikely to change in the foreseeable future; and (3) terminating the parental rights is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(a), (g)(1); *In re D.H.*, 54 Kan. App. 2d 486, 488, 401 P.3d 163 (2017).

8

Parents who have assumed parental responsibilities "have a fundamental right to raise their children that is protected by the United States Constitution and the Kansas Constitution." *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). In Kansas, when a child has been adjudicated to be a child in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). The court may make the fitness findings based only on clear and convincing evidence. It must be determined on appeal whether clear and convincing evidence supports the district court's findings. K.S.A. 2020 Supp. 38-2269(a). We must determine whether the evidence, viewed in the light most favorable to the State, could have convinced a rational fact-finder that these facts were highly probable. In making this determination, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010).

In addition, we must also consider the best interests of the child. In doing so, we primarily consider the child's physical, mental, and emotional needs. K.S.A. 2020 Supp. 38-2269(g)(1). "If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2020 Supp. 38-2269(g)(1). Whether the termination of parental rights is in a child's best interests is based on a preponderance of the evidence and is reviewed for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). A district court abuses its discretion when no reasonable person would agree with its decision or when the decision stems from a legal or factual error. *In re M.S.*, 56 Kan. App. 2d 1247, 1255, 447 P.3d 994 (2019). This court reviews all the evidence in the light most favorable to the State to determine whether a rational fact-finder could have found the determination to be highly probable, i.e. based on clear and convincing evidence. 56 Kan. App. 2d 1247, Syl. ¶ 4.

An appellate court does not reweigh conflicting evidence, reassess witnesses' credibility, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Father had stipulated previously that P.B. was in need of care, and he does not dispute that on appeal. Essentially, he argues the State failed to present clear and convincing evidence that he was unfit because there is no showing of unfitness beyond his incarceration. In addition, he contends the agencies involved had not made reasonable efforts to reintegrate him with his children.

K.S.A. 2020 Supp. 38-2269(b) provides a list of nonexclusive factors a court shall consider in determining unfitness. The court must also consider a separate list of nonexclusive factors when a child is not in the parents' physical custody, which is the case here. See K.S.A. 2020 Supp. 38-2269(c). Any one of the factors set forth in K.S.A. 2020 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2020 Supp. 38-2269(f). In deciding whether termination is in the best interests of the child, the district court should give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2020 Supp. 38-2269(g)(1).

With these standards in mind, we turn to the merits of Father's appeal. Here, the State presented evidence on two of the factors to prove that Father was unfit: (1) conviction of a felony and imprisonment (K.S.A 2020 Supp. 38-2269[b][5]); and (2) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family (K.S.A. 2020 Supp. 38-2269[b][7]). The records show that Kansas agency workers have been involved with this family since June 2012, when P.B. first spent a year in foster care. Although Father regained custody of P.B. in June 2013, the child was once again placed in foster care after Father was arrested for aggravated battery in June 2018.

Father has failed to complete any of the tasks set forth in the case plan. Although it was impossible for Father to complete all of the case plan tasks while incarcerated, he never took the first step of getting in touch with the case manager to determine which, if any, of the orders could be addressed while he was in custody. Urban testified she had sent letters, called the jail, and attempted to contact Father through his case manager and his family. Urban had successfully helped other parents work on tasks in their case plan through Zoom sessions during their incarceration. Father did not make any contact with Urban to begin that process. As such, we find evidence supporting the district court's finding that Father failed to carry out a reasonable court-approved plan aimed at reintegration.

Father acknowledged at the hearing that he would not be released from prison until February 2022. While placed in the foster home, P.B. was attending therapy and performing well in school. Urban testified that it was in P.B.'s best interests to terminate Father's parental rights and pursue the goal of adoption in the home of her foster parents. Urban testified that P.B. loved her foster parents and was excited about a future adoption.

In making its decision, the district court acknowledged that P.B. had been out of the home since June 2018 and she deserved permanency and a stable home. The district court also acknowledged that a year in a child's life is more significant than a year in an adult's life. Even if Father was able to assume care of P.B. in February 2022 or soon thereafter, P.B. would have been in out-of-home placement for over 3 1/2 years by that time. During the time that Father was in prison, P.B. had only one unauthorized contact with Father. The district court determined that Father was unfit by reason of his incarceration and that he had not completed any case plan tasks aimed at reintegration. Father claims he was a fit parent and it was in P.B.'s best interests to delay permanency until his release from prison. Father essentially asks this court to reweigh the evidence, pointing to the fact that he had been a good parent to P.B. in the past and he could assume that role upon his release. Our role, however, is not to reweigh the evidence. We

11

acknowledge the State presented sufficient evidence to support the district court's finding that Father was unfit.

There is no set amount of time that constitutes the "foreseeable future." Kansas measures this time "from the child's perspective, not the parent['s], as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009); see K.S.A. 2020 Supp. 38-2201(b)(4). This court has considered periods of time as short as seven months to be the foreseeable future from a child's perspective. 41 Kan. App. 2d at 790. Children have the right to permanency in a time frame reasonable to them. In making this determination, the court may look to the parents' past conduct—as the district court did in this case—as indicative of future behavior. See *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018). "[A] child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

Even if Father got out of prison in 16 months, that does not mean that he would automatically get custody. He would need to reestablish himself in the community. He would need to establish a residence, a job, and maintain stability. After his release he would need to complete the case plan set out for him, and there would be no guarantee that he would do so. He would have to remain free of legal entanglements, which his history shows is a valid concern. While Father might have gotten out of jail in 16 months, that period is not a true measure of when, or if, he would ever be in a position to parent. Viewing the evidence in a light most favorable to the State, we find clear and convincing evidence to support the district court's findings that Father's unfitness was unlikely to change in the foreseeable future.

Father also challenges the district court's finding that termination was in the best interests of the P.B. He argues that terminating his rights denies P.B. the right to be with a loving father and his extended family. Once the district court finds that a parent is unfit

12

and unlikely to change in the foreseeable future, it must determine whether termination of parental rights is in the best interests of the child or children involved. K.S.A. 2020 Supp. 38-2269(g)(1). The statute provides that in making that determination, the court shall give primary consideration to the physical, mental, or emotional health of the child. K.S.A. 2020 Supp. 38-2269(g)(1).

The determination of the best interests of the child is entrusted to the district court's sound judicial discretion. As such, our review of this determination is for an abuse of discretion. *In re M.S.*, 56 Kan. App. 2d at 1264; *In re K.R.*, 43 Kan. App. 2d 891, 903, 233 P.3d 746 (2010). A district court abuses its discretion if it bases its decision on an error of fact or law or if no reasonable person would agree with its decision. *In re M.S.*, 56 Kan. App. 2d at 1255. The court should weigh the benefits of permanency for the child without the presence of a parent against the continued presence of the parent and the attendant issues created in the child's life. The court should further consider the relationship between the parent and children and the trauma that may be caused by termination. *In re K.R.*, 43 Kan. App. 2d at 904.

In its ruling, the district court addressed P.B.'s need for permanency. The district court specifically acknowledged that P.B. had been in custody for a long time, and it was not in her best interests to remain in foster care without permanency. After considering that Father would be released from prison in February 2022 and then would still need to accomplish his case plan tasks, the district court stated:

> "[P.B.] doesn't deserve to be in care for that long. We're here to talk about her best interest, and that's what I'm worried about. Again, you know, we can talk about child time all the time in this court. What a year is to an adult is much, much longer to a child. And to a young child, that's a significant amount of time she's already spent in DCF custody and she deserves permanency."

13

The district court considered the passage of time in this case from the child's perspective, and that consideration is in line with Kansas caselaw and the guidance the Legislature provided in K.S.A. 2020 Supp. 38-2201(b)(4). Considering the evidence in the record, we have no difficulty concluding that the district court did not abuse its discretion in finding that termination of parental rights was in P.B.'s best interests. A rational fact-finder could have found that delaying permanency would not be in her best interests in this case.

Finally, Father complains that the court-ordered reintegration plan was not reasonable. We find this issue is not properly preserved for review. Father did not challenge his case plan as unreasonable at the district court level, and his case plan remained unchanged from June 2018 until the termination hearing in October 2020. Generally, issues not raised before the trial court cannot be raised on appeal. *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016).

Although there are three main exceptions to this general rule, Father does not assert any exception on appeal. *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008), *cert. denied* 555 U.S. 1178 (2009) (listing exceptions). Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 35) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). In *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014) the Kansas Supreme Court warned that Supreme Court Rule 6.02(a)(5) would be strictly enforced in future appellate cases, and in *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 (2015) the Kansas Supreme Court held there was no excuse for noncompliance with Rule 6.02(a)(5). Litigants who fail to comply with this rule risk a ruling that the issue is improperly briefed and the issue will be deemed waived or abandoned. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). A panel of this court recently applied Rule 6.02(a)(5) to an issue in a case involving the termination of parental rights and found the newly raised issue was waived and abandoned. *In re*

14

*R.J.*, No. 122,230, 2021 WL 137346, at \*3-4 (Kan. App. 2021) (unpublished opinion), *petition for rev. filed* April 16, 2021. We conclude that Father's final issue was waived or abandoned.

Viewed in the light most favorable to the prevailing party, we find clear and convincing evidence to support the district court's finding that Father was unfit and the conduct or condition rendering Father unfit to care for P.B. was unlikely to change in the foreseeable future. In addition, Father failed to show that the district court abused its discretion in ruling that termination of his parental rights was in P.B.'s best interests. Finally, any challenge to the case plan as unreasonable is deemed waived and abandoned by Father's failure to comply with Rule 6.02(a)(5). We therefore affirm the district court's order terminating Father's parental rights.

Affirmed.